UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AHMAD TAYLOR MUHAMMAD,<br><br>Defendant. | No. 1:23-cr-00236-NODJ-BAM-1<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br>(Doc. No. 28) |

This matter is before the court on defendant Ahmad Taylor Muhammad's motion to suppress evidence seized as a result of his encounter with Fresno police officer Leopoldo Quezada on September 26, 2023. (Doc. No. 28.) Defendant Muhammad filed the pending motion on June 3, 2024. (*Id.*) The government filed its opposition on June 24, 2024, and defendant filed his reply thereto on July 8, 2024. (Doc. Nos. 36, 39.)

The court first heard oral argument on the motion on July 17, 2024. (Doc. No. 41.) Assistant U.S. Attorney Cody Chapple appeared at the hearing on behalf of the government and Assistant Federal Defender Erin Snider appeared on behalf of defendant Muhammad. (*Id.*) At that hearing both parties took the position that the evidentiary record before the court was adequate and that no evidentiary hearing was necessary. However, after the hearing, the government filed a supplemental brief in opposition to the motion and attached to it the declaration of officer Quezada. (Doc. No. 42.) Finding that defendant Muhammad would be

1  entitled to cross examine officer Quezada on his declaration were it to be considered by the court,
2  the court construed this filing as the government's belated request for an evidentiary hearing[1] and
3  the court granted that request. (Doc. No. 45.) That evidentiary hearing was held on August 26,
4  2024. (Doc. No. 54.) At the conclusion of that hearing, the motion was taken under submission
5  for decision. (Doc. No. 54.) For the reasons explained below, defendant's motion to suppress
6  will be denied.

## BACKGROUND

An indictment charging defendant Ahmad Taylor Muhammad with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) was returned on December 21, 2023. (Doc. No. 8 at 1–2.) Specifically, defendant is charged in that indictment with possession of a Taurus PT140 G2 .40 caliber pistol. (*Id*. at 2.)

In addition to officer Quezada's testimony elicited at the evidentiary hearing[2], also before the court are five exhibits filed by defendant in support of his motion (Doc. No. 28-1), and the declaration submitted by the government in support of its supplemental opposition (Doc. No. 42-1). Collectively, the evidentiary hearing, exhibits, and briefing submitted by the parties in connection with the pending motion reflect the following.

On September 26, 2023, at 11:47a.m., the Fresno Police Department received a report that a ShotSpotter[3] device had detected three rounds of gunfire at Wayne's Liquor store, 54 East California Avenue, near Edison High School and Franklin Elementary School in Southwest Fresno. (Doc. Nos. 28 at 3; 36 at 2.) Officer Quezada responded and arrived at Wayne's Liquor

---

[1] Upon defendant Muhammad's later filed motion seeking clarification of the court's order, the court clarified that the evidentiary hearing would be limited in scope to examination only of officer Quezada. (Doc. Nos. 47, 48.)

[2] The court notes that it found the officer's testimony given at the evidentiary hearing to have been credible and observes that it did not appear that the defense was contending otherwise.

[3] "ShotSpotter is a surveillance system that uses sophisticated microphones to record gunshots in a specific area. After a device detects the sound of gunfire, it relays the audio file to a server in California, where an individual determines whether the sound is a shot. When that individual confirms the sound is a gunshot, ShotSpotter sends it back to the local police department." *United States v. Rickmon*, 952 F.3d 876, 878–79 (7th Cir. 2020).

at approximately 11:51a.m. (Doc. Nos. 28 at 3; 28-1 at 7.) Upon arrival, he was contacted in person by parole agent Michael Denny, who was in an unmarked car and reported he was in the area at the time of the ShotSpotter activation but did not witness anyone discharging a firearm. (Doc. Nos. 28 at 3; 28-1 at 22.) Agent Denny informed officer Quezada, however, that he heard the shots and observed three black males running from the area, one of whom was wearing all red and holding his waistband as he ran. (*Id.*) Agent Denny also advised officer Quezada that he had followed the three men to the area of Thorne Avenue and Merced Street, within walking distance of where the ShotSpotter notification came from. (Doc. Nos. 28 at 4–5; 28-1 at 22.)

According to his incident report, officer Quezada was then advised by an assisting unit that the subject[4] was seen in the area of Thorne and Valeria,[5] which is only one block from the intersection of Thorne and Merced. (Doc. No. 28-1 at 22.) Officer Quezada then activated his body-worn camera and drove to the intersection of Thorne Avenue and Valencia Street, where he saw a man wearing a red long-sleeve sweatshirt and red sweatpants, later identified as defendant Muhammad. (Doc. No. 28 at 4; 36 at 2.) Officer Quezada approached defendant Muhammad and asked, "Do you have anything on you?" to which defendant Muhammad replied, "No sir, but please don't touch me, I'm not on probation." (Doc. No. 28-1, Exhibit E, Video 00:29–00:32.) Officer Quezada placed defendant Muhammad's hands on his head and instructed "I'm just gonna check you for weapons man, interlace your fingers, you're not under arrest." (*Id.* at 00:32–00:38.) Defendant Muhammad did not immediately cooperate with the officer's attempt to pat him down, instead asserting that "this is illegal" and attempting to move away. (*Id.* at 00:38–01:17.) Officer Quezada took defendant Muhammad to the ground and handcuffed him. (*Id.* at 01:18–01:58.) Officer Quezada instructed "come up on your knees," and while attempting to reposition him, defendant Muhammad replied, "I do have something on me sir." (*Id.* at 01:58–02:04.) Officer Quezada asked, "Where is it?" and defendant Muhammad advised, "In front of

---

[4] The court presumes, as does defendant Muhammad, that "the subject" refers to the man wearing all red.

[5] Based on subsequent events and the absence of a Valeria Street in the area, the court believes this to be a reference to Valencia Street.

3

me." (*Id*. at 02:04–02:06.) Officer Quezada then rolled defendant Muhammad onto his back and retrieved a .40 caliber Taurus model PT140 G2 pistol tucked into his waistband. (*Id*. at 02:06–02:12.)[6]

Officer Quezada then placed defendant Muhammad in the backseat of his patrol car and asked, "What's your name man." (*Id*. at 03:20–03:33.) Defendant Muhammad identified himself as "Andre Bowers." (*Id*. at 03:34–03:37.) Attempts to run this name in the officer's record system were unsuccessful, but police ultimately identified defendant Muhammad through fingerprints and photographs. (Doc. Nos. 28-1 at 22; 36 at 3.) Once defendant Muhammad was identified, officer Quezada was advised that the defendant was wanted on an active pending domestic violence case, had been convicted of several felonies, and was on parole. (Doc. No. 28-1 at 22.)[7]

## LEGAL STANDARD

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

---

[6] The court notes that the body-worn camera footage depicts the encounter slightly differently than how officer Quezada recounted it in his evidentiary hearing testimony or in his report. For example, at the hearing and in officer Quezada's report, he described that after exiting his patrol vehicle, he immediately made physical contact with defendant Muhammad. (Doc. No. 28-1 at 22.) The body-worn camera footage, however, depicts that officer Quezada did not make physical contact with defendant Muhammad until after asking "Do you have anything on you?". (Doc. No. 28-1, Exhibit E, Video 00:29–00:32.) Further, in his report, officer Quezada recounted that he advised defendant Muhammad that he would "be performing a pat search due to him matching a description of a subject seen in the area." (Doc. No. 28-1 at 22.) The video footage, however, establishes that officer Quezada told defendant Muhammad "I'm just gonna check you for weapons" but did not provide a reason for doing so. (Doc. No. 28-1, Exhibit E, Video 00:32–00:38.) Finally, at the hearing, officer Quezada testified that defendant Muhammad attempted to walk away from him while claiming that the encounter was an "unlawful detention." The court does not hear defendant Muhammad in the video footage explicitly claim an "unlawful detention" but does hear him argue and resist the officer's attempt to conduct a pat-down search of his person. Ultimately, the court does not find the slight differences between officer Quezada's testimony, his police report, and his body-worn camera footage to be dispositive in resolving the pending motion or as calling the officer's credibility into question given the passage of 11 months in time between the encounter and the evidentiary hearing.

[7] Assisting officers located three shell casings in the area where the ShotSpotter alerted which were of a different caliber than the firearm found on defendant Muhammad. (Doc. No. 28 at 4–5.)

4

Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *Id*. at 30; *see also Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016) ("To initiate a brief stop to investigate potential criminal activity, a stop that does not rise to the level of an arrest, an officer must have reasonable suspicion to believe 'criminal activity may be afoot.'"). This is "not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123–24 (internal quotation marks and citation omitted); *see also Valdes-Vega*, 738 F.3d at 1078 (Although "a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."). Courts consider the totality of the circumstances in determining whether an officer had a particularized and objective basis for suspecting wrongdoing in order to justify a *Terry* stop. *United States v. Terry-Crespo*, 356 F.3d 1170, 1173 (9th Cir. 2004). The totality of the circumstances includes "objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). [8]

The government bears the burden of showing that a warrantless search or seizure does not violate the Fourth Amendment. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012); *see also United States v. Job*, 871 F.3d 852, 862 (9th Cir. 2017). Of note, given the

---

[8] The reasonable suspicion standard is intentionally abstract and courts are to give "due weight" to the factual inferences drawn by law enforcement officers. *United States v. Arvizu*, 534 U.S. 266, 273–77 (2002) (citation omitted); *see also United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) ("Reasonable suspicion 'is dependent upon both the content of information possessed by police and its degree of reliability,' and '[t]he standard takes into account the totality of the circumstances—the whole picture.'" (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

circumstances in this case, where the initial stop of an individual is justified by a reasonable suspicion officers may take reasonable measures to neutralize a risk of harm in order to pursue their investigation without fear of violence. *See Terry*, 392 U.S. at 24; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons.") (quoting *Terry*, 392 U.S. at 24); *United States v. Mackie*, 720 Fed. Appx. 872, 873, n.3 (9th Cir. 2018).[9] If the government fails to carry its burden, all fruits of the Fourth Amendment violation must be suppressed. *Cervantes*, 703 F.3d at 1142–43.

## ANALYSIS

Defendant Muhammad seeks to suppress all evidence (specifically, the .40 caliber Taurus pistol) found on his person during his encounter with officer Quezada, arguing that the officer lacked the necessary reasonable suspicion of criminal activity to justify seizing him. (Doc. No. 28 at 5–8); (*see also* Doc. No. 39 at 1 ("the sole issue before the court is whether Officer Quezada had reasonable suspicion for the initial seizure")). The government opposes the motion, arguing that under the totality of the circumstances officer Quezada did have reasonable suspicion to stop defendant Muhammad in furtherance of his investigation of the shots fired in Southwest Fresno. (Doc. No. 36 at 3–7.) According to the government those circumstances giving rise to the reasonable suspicion included: a ShotSpotter alert, the parole agent's descriptions of suspects running from the area of the gunshots, and the temporal, geographic, and physical nature of officer Quezada's observation of defendant Muhammad. (Doc. No. 36 at 3–7.) The court considers each of these circumstances below. Ultimately, the court concludes that in their totality, the facts known to officer Quezada were sufficient to provide him with a reasonable

/////
/////
/////

---

[9] Citation to this and other unpublished Ninth Circuit opinions in this order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

suspicion of criminal activity afoot justifying his stop of defendant Muhammad, which ultimately led to the discovery of the firearm.[10]

**A.     ShotSpotter Alert**

The government argues that the first circumstance contributing to officer Quezada's reasonable suspicion of criminal activity was the ShotSpotter alert. (Doc. No. 36 at 4.) In his reply brief, defendant Muhammad notes that ShotSpotter has come under scrutiny in recent years due to concerns over the reliability of the technology, its disproportionate presence in communities of color, and its role in creating hostile encounters between civilians and police. (Doc. No. 29 at 2–3.)

Neither the Supreme Court nor the Ninth Circuit have addressed the ShotSpotter technology and its role in establishing reasonable suspicion justifying a *Terry* stop, but two other circuit courts have. In *United States v. Rickmon*, 952 F.3d 876 (7th Cir. 2020), the Seventh Circuit held that ShotSpotter alerts are analogous to an anonymous tip and may contribute to an officer's reasonable suspicion of criminal activity when corroborated by other sources of information, such as 911 calls or radio dispatches relaying accounts of the scene. *Id*. at 882. In *United States v. Jones*, 1 F.4th 50 (D.C. Cir. 2021), the D.C. Circuit concluded that a recent ShotSpotter alert, combined with corroborating calls from neighbors and the defendant's evasive behavior of walking away quickly and failing to respond to officers, considered together, amounted to reasonable suspicion justifying a stop. *Id*. at 54. Only one district court in this circuit has considered a ShotSpotter alert and it too found that the alert, corroborated by two 911 calls and one face-to-face tip, contributed to the officers' reasonable suspicion. *United States v. Aguilera*, No. 23-cr-00217-WHA, 2024 WL 1244479, at *15 (N.D. Cal. Mar. 22, 2024). Based on these authorities, the undersigned also concludes that a ShotSpotter alert can contribute to a reasonable suspicion of criminal activity when corroborated by other information. Here, the

---

[10] The court need not analyze officer Quezada's frisk of defendant Muhammad for weapons following the initial seizure, since the parties only dispute whether there was reasonable suspicion justifying the initial seizure of defendant. *See* Doc. No. 39 at 2 (noting that "the seizure Mr. Muhammad is challenging is officer Quezada's grabbing of Mr. Muhammad's hands within the first fifteen seconds of the encounter").

1  ShotSpotter alert was corroborated by parole agent Denny informing officer Quezada that he
2  heard the gunshots while he was in the area on a separate matter.  (Doc. Nos. 36 at 2; 39 at 3.)
3  Accordingly, the ShotSpotter alert and Denny's corroboration of shots in the area both contribute
4  to officer Quezada's reasonable suspicion of criminal activity.

5  **B.     Parole Agent Denny's Descriptions**

6  The government next argues that agent Denny's description of three suspects running
7  from the area of the gunshots, and in particular one suspect holding his waistband as he ran,
8  further supports a reasonable suspicion to stop defendant Muhammad.  (Doc. No. 36 at 5–6.)
9  Defendant Muhammad argues that running away from gunfire is hardly suspicious, and wearing
10 pants below the waistline that need to be held up is a fashion trend that is also not inherently
11 suspicious.  (Doc. No. 28 at 6–7.)

12 While the court agrees with defendant that there can be explanations for running from the
13 sound of gunfire and holding one's waistband while running that do not involve participation in
14 criminal activity, these observations may still properly contribute to an officer's reasonable
15 suspicion without requiring the officer to rule out all non-criminal alternative explanations.
16 *United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion
17 exists, however, need not rule out the possibility of innocent conduct."); *see also United States v.*
18 *Berber-Tinoco*, 510 F.3d 1083, 1089 (9th Cir. 2007) ("Alternate explanations for individual
19 factors are unpersuasive if the factors, when viewed in their totality . . . create reasonable
20 suspicion of criminal activity.") (internal quotation marks and citation omitted).  Further, "[w]hile
21 flight is not necessarily indicative of ongoing criminal activity, *Terry* recognized that officers can
22 detain individuals to resolve ambiguities in their conduct."  *Wardlow*, 528 U.S. at 120.

23 Defendant Muhammad argues that running from gunfire is simply logical and that
24 remaining at the scene of a shooting would be more suspicious than running away.  (Doc. No. 28
25 at 6.)  However, officer Quezada declared that he has received training which included viewing
26 body camera videos of suspects fleeing from the scene of shootings.  (Doc. No. 42-1 at 2.)
27 Accordingly, the court finds that parole agent Denny's observation that three men were running
28 from the area of the gunshots and that the man dressed in red was holding his waistband as he ran,

which he reported to officer Quezada, contributed to Quezada's reasonable suspicion of criminal activity afoot. That reasonable suspicion existed even if the conduct viewed was arguably ambiguous or might have had an innocent explanation. *See Berber-Tinoco*, 510 F.3d at 1089 (noting that in analyzing whether a *Terry* stop is supported by reasonable suspicion, courts "giv[e] due weight to the officers' experience and reasonable deductions"); *see also United States v. Senator*, No. 3:11-cr-00442-BR, 2013 WL 1562851, at *2, 10 (D. Or. Apr. 11, 2013) (finding that a witness' report that he "heard a loud noise that sounded like a gunshot" and then "observed two 'guys' running uphill and to the northeast away from the scene towards Bray Avenue, one wearing a white sweater and the other wearing all black clothing" contributed to the officer's "reasonable suspicion that the [defendants] might be engaged in criminal activity").

Further, officer Quezada also declared that in his experience, he has seen suspects run while holding their waistband and later, when apprehended, he determined that they were concealing a firearm and securing it with their hands over their clothes. (Doc. No. 42-1 at 2.)[11] Defendant Muhammad cites authority for the proposition that an officer does not have reasonable suspicion of criminal activity after merely observing a person clutching their clothing or having a bulge in their clothing. (Doc. No. 28 at 7) (citing *United States v. Jones*, 606 F.3d 964, 965 (8th Cir. 2010) (finding that the officer lacked reasonable suspicion where the defendant merely "clutch[ed] the front area of his hoodie pocket" and "watched as the marked police cruiser drove by"); *United States v. Kelly*, 481 F. Supp. 3d 862, 873 (S.D. Iowa 2020) (granting the defendant's motion to suppress where "the only basis for investigating [the defendant] as he walked to and from Hy-Vee Gas and suspecting him of carrying a weapon" was his physical description and that he "appeared to have some unspecified heavy object in his front right pocket"); *United States v. Davis*, No. 08-cr-00028-LHR, 2008 WL 4372705, at *1 (S.D. Tex. Sept. 22, 2008) (denying reconsideration of an order granting the defendant's motion to suppress where the officer "thought that he recognized [the defendant] as someone with some gang connection" but "did not

---

[11] Officer Quezada also testified at the evidentiary hearing that in his six years as a patrol officer with the Fresno Police Department, he has encountered an armed individual approximately one to two times per week on average, and a person with a concealed firearm on average about once per month.

9

1    recall specifics," the defendant had a "nervous or panicked expression," and the officer noticed a
2    bulge where the defendant was holding his clothing near his waist)).

3    However, in each case referenced above and relied upon by defendant Muhammad, the
4    defendant was seized based on an officer's observations of their clothing while the defendant was
5    simply standing or walking with no suspected criminal activity in progress at the time.  Defendant
6    Muhammad has cited no case in which a court has found a defendant to be wrongfully seized
7    while holding onto their clothing and running away immediately after shots were fired in the area.
8    Accordingly, the court finds that parole agent Denny's observation that one of the men running
9    from the liquor store parking lot was holding his waistband appropriately contributed to officer
10   Quezada's reasonable suspicion of criminal activity as well.  *See United States v. Cotton*, No. 17-
11   cr-01908-BEN, 2018 WL 4599820, at *9 (S.D. Cal. Sept. 24, 2018) ("Because the agents
12   observed and/or heard over the radio that Defendant seemed to be concealing something heavy
13   like a firearm in his waistband, appeared to be surveilling the area just prior to a looming drug
14   deal, and engaged twice with the drug operation's target, agents had sufficient reasonable
15   suspicion to stop Defendant . . . ."); *see also Warren v. Marcus*, 78 F. Supp. 3d 1228, 1246 (N.D.
16   Cal. 2015) (granting summary judgment in favor of the defendant as to the plaintiff's claim that
17   his *Terry* stop was not supported by reasonable suspicion where the defendant officer received an
18   "initial report of a man with a gun" and "reports providing a specific physical description of the
19   suspect that [p]laintiff matched exactly, as well as a report that he was seen holding his
20   waistband"); *Smalls v. City of Tacoma*, No. 3:22-cv-05043, 2023 WL 3076643, at *9 (W.D.
21   Wash. Apr. 25, 2023) (finding that an officer's observation that "Bennie had been 'holding his
22   waistband as if concealing something'" supported the officer's reasonable suspicion that Bennie
23   was carrying a weapon).

24   **C.     Officer Quezada's Observations**

25   The government additionally argues that officer Quezada had reasonable suspicion to stop
26   defendant Muhammad based on the nature of his own independent observations of the defendant.
27   (Doc. No. 36 at 6.)  These included a physical match to the parole agent's description of one of
28   the individuals who ran away and the proximity in time and location to the shots fired at Wayne's

Liquor. (*Id.*) The government notes that officer Quezada observed defendant Muhammad wearing all red, aligning with the description given by agent Denny of the man running from the scene grasping his waistband. (*Id.*; Doc. No. 28-1 at 22.) Officer Quezada encountered defendant Muhammad one block beyond where parole agent Denny had followed the three running men to, in the direction reported by agent Denny, and in the exact location where an assisting unit had advised officer Quezada that "the subject" was seen. (Doc. Nos. 28 at 4; 28-1 at 22.) This location was about four to five blocks from Wayne's Liquor, where the shots were fired, and officer Quezada encountered defendant Muhammad there only approximately eight minutes after those shots. (Doc. No. 36 at 6–7.) The government asserts that these facts collectively support officer Quezada's reasonable suspicion. (*Id.*) In response, defendant Muhammad argues that officer Quezada's observations only indicate his presence near Wayne's Liquor at the time the shots were fired, not that defendant Muhammad was engaged in criminal activity. (Doc. No. 39 at 4.)

      The court finds that the nature of officer Quezada's observations does support a reasonable suspicion of criminal activity for the purposes of the *Terry* stop of defendant Muhammad. As stated above, officer Quezada encountered a black man wearing all red, matching the description of the person who had been seen running from the area of the shots fired while holding his waistband, shortly after those shots were fired, near where the shots were fired, and in the direction that he was seen running. Officer Quezada did not need to be specifically informed that the person seen wearing all red was the shooter in order to have a reasonable suspicion of criminal activity on the part of the man in red. *See United States v. Rodriguez*, No. 3:21-cr-00002-LRH-CLB, 2021 WL 3932244, at *2 (D. Nev. Sept. 2, 2021) (finding that an officer had reasonable suspicion to stop the defendant where "he received information from [another officer] that an individual wearing blue, who *may be involved* with the shooting, was walking toward him") (emphasis added). Further, the timing and location in which an officer encounters a person after a crime has occurred can be relevant to that officer's reasonable suspicion of their involvement in that crime, particularly if they are found shortly after and in the nearby area. *See United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) (finding that "the

1 defendants' presence on a likely escape route one-half mile from the bank and a few blocks from
2 the suspected getaway car, only 15 minutes after the robbery" was one of the circumstances that
3 "justified the police officers' decision to make an investigatory stop").

Accordingly, the nature of officer Quezada's observations of defendant Muhammad, including what he was wearing and where he was found shortly after the shots were fired, further supports the officer's reasonable suspicion. *See United States v. Lacy*, 243 F.3d 551, at *2 (9th Cir. 2000) (finding that an "investigatory stop was permissible" where "Lacy was stopped within minutes of the robbery" and "Lacy and his co-defendant were the only individuals in the area to match the descriptions of the suspects").

**D.     The Totality of the Circumstances**

The court has found that each circumstance described above properly contributed to officer Quezada's reasonable suspicion of criminal activity afoot. The court now also concludes that in totality, the circumstances present in this case established a reasonable suspicion justifying officer Quezada's stop of defendant Muhammad. *See United States v. Vandergroen*, No. 18-cr-00133-PJH-1, 2018 WL 4053483, at *5 (N.D. Cal. Aug. 24, 2018), *aff'd*, 964 F.3d 876 (9th Cir. 2020), and *aff'd*, 817 F. App'x 420 (9th Cir. 2020) (finding reasonable suspicion based solely on a tip from a witness who did not state that he personally saw defendant with a gun, but reported that others did, and who identified the defendant's car and provided information "about defendant's location and movements"); *United States v. Johnson*, No. 18-cr-00031-JSW-1, 2018 WL 2763327, at *6, 8 (N.D. Cal. June 8, 2018) (finding that officers had reasonable suspicion to detain the defendant based solely on a 911 call describing the "attire and physical traits" of a person reportedly "carrying a weapon in his pants" where the "reporting party had not seen all of the gun" and the defendant "was the only person on the scene who matched that description"); *see also Warren*, 78 F. Supp. 3d at 1246 (finding reasonable suspicion for purposes of a detention based solely on a report of a man with a gun, a report of a man seen running holding his waistband, and "subsequent reports providing a physical description of the suspect that matched [p]laintiff exactly"). As acknowledged above, there can be innocent explanations for each of the factors present here. However, that is not the relevant inquiry. Rather, considered together, the

information known to officer Quezada at the time established a reasonable suspicion and justified his stop of defendant. *See United States v. Diaz-Juarez*, 299 F.3d 1138, 1141–42 (9th Cir. 2002) ("Individual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together. While some of the factors that led Agent Rodriguez to stop Diaz may, when viewed in isolation, be innocently explainable, when viewed in their totality, they create reasonable suspicion of criminal activity.") (citation omitted). Accordingly, defendant Muhammad's motion to suppress will be denied.

## CONCLUSION

For the reasons explained above, defendant's motion to suppress (Doc. No. 28) is denied. This case is now scheduled for a status conference before Magistrate Judge Barbara A. McAuliffe on September 11, 2024 at 1:00 p.m.

IT IS SO ORDERED.

Dated: **September 3, 2024**

          *Dale A. Drozd*
DALE A. DROZD
UNITED STATES DISTRICT JUDGE

13